UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                                   Case No. 16-20460-7
                                                 Hon. Mark A. Goldsmith

vs.

D-7 MARIO JACKSON,

      Defendant.
_____/

## OPINION & ORDER
## DENYING DEFENDANT'S MOTION FOR SENTENCE REDUCTION (Dkt. 1422)

Defendant Mario Jackson pleaded guilty to racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). See Am. Judgment (Dkt. 842). This Court sentenced Jackson to 114 months' imprisonment. Id. Jackson, age 27, is currently incarcerated at FCI Hazelton. His projected release date is January 25, 2025.

On July 16, 2020, Jackson filed a motion to reduce his sentence under 18 U.S.C. § 3582(c), arguing that he should be released so that he can help take care of his sick mother (Dkt. 1306). On October 26, 2020, the Court denied Jackson's motion without prejudice, due to his failure to exhaust his administrative remedies (Dkt. 1343).

Jackson has now filed a new motion for a sentence reduction, arguing that (i) his need to care for his sick mother, (ii) his overly long sentence as compared to his equally-culpable co-defendants, and (iii) his youth at the time of the offense each constitute extraordinary and compelling reasons for release (Dkt. 1422). The Government argues that "Jackson has properly exhausted only one of his claims, involving his mother's medical struggles" because "[h]is additional claims for his eligibility for early release, relating to an alleged sentencing disparity

between he and his co-defendants, and his young age at the time of the offense, were never raised to the Warden." Resp. at 3 (Dkt. 1425). The Government further argues that, even if exhaustion is satisfied, Jacksons has not shown extraordinary and compelling reasons for release and, in any event, the factors listed in 18 U.S.C. § 3553(a) weigh against release.

Even assuming that Jackson has properly complied with the mandatory exhaustion requirements as to each of his claims, he nevertheless has failed to show extraordinary and compelling reasons for his release. In addition, the § 3553(a) factors do not support reducing his sentence. Accordingly, Jackson's motion is denied.[1]

## I. BACKGROUND

The "6 Mile Chedda Grove" is a street gang that operated on the east side of Detroit and has engaged in criminal activities including murder, attempted murder, robbery, attempted robbery, and the distribution of illegal narcotics. Jackson was associated with the gang since at least December 31, 2011, when Detroit law enforcement officers encountered Jackson in a car with other gang members, along with firearms and ammunition. Jackson was involved in significant travel to states where the gang dealt drugs including cocaine. He was convicted for racketeering conspiracy.

Jackson requested release administratively by filling out a request for reduction in sentence form. Request for Release (Dkt. 1425-2). The form, dated September 2, 2020, provides various options to check for the type of reduction in sentence sought; Jackson placed a check on the line next to "[i]ncapacitation of a spouse or registered partner." Id. at PageID.16805. In the section of the form that permits a prisoner to provide "additional information you wish to be considered,"

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

Jackson wrote, "To help take care of my brother who had a seizure." Id. at PageID.16806. The Warden of the facility where Jackson is incarcerated denied Jackson's request in a response letter dated September 22, 2020. Denial (Dkt. 1423-1). The Warden stated that Jackson's request was denied because he failed to verify his relationship with the incapacitated individual and provide verifiable medical documentation that the individual had suffered a serious injury or illness resulting in complete disability and incapability of providing self-care. Id. at PageID.16631.

## II. LEGAL STANDARD

The First Step Act modified the statute concerning the compassionate release of federal prisoners, 18 U.S.C. § 3582(c), such that district courts may entertain motions filed by incarcerated defendants seeking to reduce their sentences. United States v. Ruffin, 978 F.3d 1000, 1003–1004 (6th Cir. 2020). Before granting a compassionate-release motion, a district court must engage in a three-step inquiry: (i) the court must find that "extraordinary and compelling reasons warrant [a sentence] reduction," (ii) it must ensure "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (iii) it must "consider[] all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." United States v. Jones, 980 F.3d 1098, 1101 (6th Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). If all of those requirements are met, the district court "may reduce the term of imprisonment," but it need not do so. 18 U.S.C. § 3582(c)(1)(A).

Regarding the first step of the inquiry, the Sixth Circuit has held that, with respect to motions for compassionate release filed by imprisoned individuals, "extraordinary and compelling" reasons are not limited to those set forth in U.S.S.G. § 1B1.13. Jones, 980 F.3d at 1109. It further held that "[u]ntil the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary

3

and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." Id.

### III. ANALYSIS

**A. Exhaustion**

Before seeking compassionate release from federal courts, prisoners must "fully exhaust[] all administrative rights," or, alternatively, wait for 30 days after the warden's "receipt of [their] request." 18 U.S.C. § 3582(c)(1)(A). There are no statutory exceptions to this exhaustion requirement. United States v. Alam, 960 F.3d 831, 835–836 (6th Cir. 2020).

The Government concedes that Jackson sought release administratively by filling out a form requesting a sentence reduction, which was denied by the Warden in September 2020. Resp. at 6.[2] However, the Government argues that Jackson only properly exhausted his claim for release to care for his mother, not his claims based on his disparate sentence and youthfulness. Resp. at 8, 11. In support of its argument that "an inmate may not move for compassionate release on a different ground than the one he raised during the administrative process," id. at 9, the Government

---

[2] On April 18, 2021—over two weeks after Jackson filed the instant motion for a sentence reduction—he sent the Warden a renewed request for compassionate release, this time providing that he was seeking release based on his desire to care for his mother, his sentencing disparity, and his youthfulness. Renewed Request (Dkt. 1427-2). Although 30 days have now passed since Jackson sent this request to the Warden, because Jackson failed to send this renewed request before filing the instant motion, the Court will not consider it in determining whether Jackson has satisfied the exhaustion requirement. See 10/26/20 Op. at 2 (Dkt. 1343) (denying Jackson's first motion for compassionate release because, "even assuming that Jackson did submit his request form to the warden, Jackson did not wait 30 days before filing his motion"); § 3582(c)(1)(A) ("[T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .") (emphasis added); United States v. Baez, No. 2:17-cr-20631-2, 2021 WL 1056839, at *1 (E.D. Mich. Mar. 18, 2021) (denying motion for compassionate release because "Defendant did not exhaust his administrative remedies prior to filing the present motion").

cites an opinion issued by another court within this district, United States v. Asmar, 465 F. Supp. 3d 716, 719 (E.D. Mich. 2020). In that case, the court explained that, by making the exhaustion requirement mandatory, § 3582(c)(1)(A) arguably mandates that the BOP be given the first opportunity to evaluate a defendant's request; the BOP is deprived of this opportunity "[w]here the factual basis in the administrative request and the motion before the court are different." Id.

Jackson argues that § 3582(c)(1)(A) does not facially require issue exhaustion. Reply at 1 (Dkt. 1427). Moreover, Jackson argues, courts are not bound by typical standards governing judicial review of agency decisions in resolving § 3582(c)(1)(A) motions. Id. at 2 (citing Jones, 980 F.3d at 1109, 1111). Therefore, Jackson concludes, it would make little sense to read a particularity requirement into the exhaustion requirement.

As the parties' briefing highlights, there are arguments on both sides of this issue. Ultimately, however, the Court need not decide whether Jackson failed to properly exhaust his administrative remedies as to all claims raised in the instant motion for a sentence reduction. Even assuming that Jackson has complied with the exhaustion requirement as to all his claims, each claim fails on the merits, for the reasons provided below.

### B. Extraordinary and Compelling Circumstances

Jackson argues that the following reasons are extraordinary and compelling: (i) his need to care for his sick mother, (ii) his overly long sentence as compared to his equally-culpable co-defendants, and (iii) his youth at the time of the offense. The Court concludes that none of these reasons is extraordinary and compelling. Even if they were, the § 3553(a) factors weigh against granting release.

### i. Jackson's Mother

Jackson seeks a sentence reduction so that he may care for his mother, who suffers from lupus and myelodysplastic syndromes. Mot. at 6. According to Jackson, due to his mother's illnesses, she has "fatigue and pain" that render her "unable to walk or even stand without severe discomfort and pain." Id. at 8–9. Despite her medical condition, his mother is responsible for caring for her three younger children who live with her—a three-year-old son, a thirteen-year-old daughter, and a twenty-two-year-old daughter who suffers from schizophrenia. Id. at 8. Jackson argues that he is the only available caretaker for his mother, even though she has three other adult children; two of these children suffer from their own health issues and the third "has to care for his own family." Id. at 9.

As Jackson points out, some courts have held that that "extraordinary and compelling reasons may exist when a defendant is the only available caregiver of incapacitated close family members other than spouses and registered partners—particularly, parents." United States v. Wooten, No. 13-cr-18, 2020 WL 6119321, at *4 (D. Conn. Oct. 16, 2020) (punctuation modified). However, multiple courts within this circuit, including this Court, have determined that it is not extraordinary to have a sick parent who may need assistance. See, e.g., United States v. Cole, No. 18-20237, 2021 WL 194194, at *3 (E.D. Mich. Jan. 20, 2021); United States v. Coates, No. 13-cr-20303, 2020 WL 7640058, *9 (E.D. Mich. Dec. 23, 2020) ("[C]ourts have concluded that taking care of an ailing parent does not present an extraordinary and compelling reason to grant release.") (collecting cases); United States v. Ingram, No. 2:14-cr-40, 2019 WL 3162305, *2 (S.D. Ohio, July 16, 2019) ("Many, if not all inmates, have aging and sick parents. Such circumstance is not extraordinary."). The reason that such circumstances are not extraordinary is that "[a] crime often inflicts harm, not only on a direct victim, but on those in a defendant's circle of family and friends

6

who depend on that defendant for all manner of support." Cole, 2021 WL 194194 at *3. This reasoning applies here.

Even if it were extraordinary for a prisoner to have a sick parent, Jackson has not shown that he is the only available caretaker for his mother; had he done so, he would have put forth an arguably compelling reason for release. Although Jackson's motion discusses his siblings' availability, he does not address other family members or friends who might be available to assist his mother. Letters attached to Jackson's motion indicate the existence of other family members and friends, such as Jackson's godmother and aunt. See Godmother Letter (Dkt. 1422-2); Aunt Letter (Dkt. 1422-7). Jackson urges the Court to adopt the view that the mere existence of other family members and friends does not necessarily mean that another caregiver is reasonably "available," or is fairly capable of assuming or continuing the burden of care. Mot. at 9. However, even under this view, Jackson's motion still fails. Jackson mentions at least one family member—his brother, Perry—who has no medical issues that would reasonably prevent him from caring for his mother.[3] Perry's only alleged impediment to providing care for his mother is the fact that he has four children. Id. However, many people care for a sick or elderly parent while also caring for other dependents; it is unclear why Perry would be unable to do so as well. Jackson's motion mentions that he himself has a child, Mot. at 21; it is unclear why Perry is any less capable of caring for their mother than Jackson would be.

The fact that Jackson's mother and other family members may miss his presence in their daily lives is unfortunate, but certainly not extraordinary. Accordingly, the Court finds that

---

[3] Jackson refers to this brother as "Perry" in his motion; however, in a letter from his mother attached to his motion, his mother refers to this brother as "Terry." See Mother Letter (Dkt. 1422-3).

7

Jackson's alleged need to care for his sick mother is not an extraordinary and compelling reason that warrants reducing his sentence.

### ii. Sentencing Disparity

Jackson also argues that his disproportionately greater sentence—compared to some of his co-defendants—is an extraordinary and compelling circumstance justifying a sentence reduction. Mot. at 11. Specifically, Jackson argues that he received a sentence "almost four times longer" than several of his co-defendants who also pled guilty to one count of racketeering conspiracy and had functionally the same role as Jackson. Id. at 12. Jackson argues that he received a longer sentence than these co-defendants for two reasons. First, Jackson's guideline range was calculated based off the conspiracy to commit murder guideline "despite the government never naming Mr. Jackson as being involved with the murder" and despite the fact that "[t]he Sentencing Guidelines dictate that . . . the base offense level should be determined based on 'the offense conduct charged in the count of the indictment or information of which the defendant was convicted.'" Id. at 12–13 (quoting U.S.S.G. § 1B1.2(a)). Second, "the [Presentence Report (PSR)] incorrectly described Mr. Jackson's criminal history by classifying his 2014 conviction as criminal history and not relevant conduct." Id. at 14.

The Government argues that Jackson's conduct was not the same as the co-defendants whom he highlights; the available evidence demonstrated that the murders committed by others were foreseeable acts in furtherance of the same racketeering conspiracy to which Jackson was a party. See Resp. at 16. Indeed, the evidence showed that Jackson had a closer association with the gang's violence—including murder—than the co-defendants to which he compares himself did. For instance, on August 20, 2015, Jackson was found alongside co-defendants Donell

Thompson and Lomnil Jackson just hours after these two had committed a murder. PSR ¶ 24–25.[4] Further, on December 16, 2014, Jackson and two co-defendant gang members confronted unknown individuals; Jackson and one of his co-defendants pulled guns on these individuals. Id. ¶ 54; 2d Superseding Indictment at 15 (Dkt. 292). As the Government argues, "[t]his aggravated Jackson's role in the conspiracy considerably and resulted in the high base offense level of 33 found in § 2A1.5(a) being applied to him, but not to others." Resp. at 16.

The Government also argues that Jackson's criminal history category was calculated correctly. Specifically, as the Government stated in its objection to the initial PSR, the final PSR correctly classified Jackson's 2014 conviction as criminal history because, "[p]ursuant to U.S.S.G. § 2E1.1, Application Note 4, prior criminal convictions that are part of the pattern of racketeering activity are treated as a prior sentence under U.S.S.G. § 4A1.2(a)(1), other than the last overt act of the instant offense." Obj. to PSR (Dkt. 1425-3).

Because courts have broad discretion to determine what constitutes extraordinary and compelling reasons in the context of a prisoner-filed motion for compassionate release, Jones, 980 F.3d at 1109, it follows that courts have the discretion to consider whether an unjustified sentencing disparity is extraordinary and compelling, see United States v. McDonald, No. 94-cr-20256, 2020 WL 3166741, at *7 (W.D. Tenn. June 8, 2020). Here, the reason that Jackson was sentenced to a longer term of imprisonment has to do with the calculation of his offense level and criminal history category. Jackson attempts to show that both his offense level and criminal history

---

[4] In his reply, Jackson queries "how something happening in the past is foreseeable," i.e., how the fact that he was found with two co-defendants after they committed murder means that this murder would have been reasonably foreseeable to Jackson. Reply at 5–6. This argument obscures the point. Such evidence shows that Jackson was closely associated with the gang and its use of murder to achieve its objectives. Jackson's close association with the murderers tends to show that it was reasonably foreseeable to Jackson that gang members would commit murders.

9

category were calculated incorrectly. Curiously, however, he failed to raise such objections when accepting his plea agreement and when given an opportunity to raise issues regarding the guidelines imprisonment range calculations included in the PSR; to allow an about-face on this now would violate Jackson's promise in the Rule 11 Plea agreement not to take guideline positions inconsistent with those set out in the agreement.[5] In any event, the Court is satisfied, based on the reasons articulated in the Government's brief, that Jackson's offense level and criminal history category were not calculated in error. Consequently, any sentencing disparity between Jackson and his co-defendants is justified. Jackson's sentencing disparity is, therefore, not an extraordinary and compelling reason to reduce his sentence.[6]

### iii. Youthfulness

Finally, Jackson argues that his youthfulness at the time that he committed his crimes is an extraordinary and compelling circumstance warranting a sentence reduction. He was 18 years old

---

[5] In Jackson's Rule 11 Plea Agreement, he agreed that "[t]here are no sentencing guidelines disputes," and that he would not "take a position concerning the applicable guidelines that is different from any position . . . reflected in the attached worksheets." Plea Agreement (Dkt. 325). The guidelines worksheets attached to the plea agreement further provide that the parties' agreement that the "Conspiracy to Commit Murder" base offense level at U.S.S.G. § 2A1.5(a) should be applied. Id. In addition, the PSR, prepared independently by the U.S. Probation Department, came to the same conclusion, cross referencing to the base offense level for Conspiracy to Commit Murder at § 2A1.5(a); however, Jackson did not object to that calculation. See PSR ¶ 32. Finally, as for Jackson's criminal history, the Government addressed this issue in an objection to the initial PSR, in which Jackson's criminal history was calculated as Jackson now suggests it should have been. Following the Government's objection letter, the final PSR calculated Jackson's criminal history as category II. Jackson did not object at the time of sentencing.

[6] Jackson emphasizes that he was the first member of the conspiracy to plead guilty, Mot. at 3, 12, thereby suggesting that he may have insisted on a different plea agreement had he known that his co-defendants would obtain different plea agreements. Jackson may now regret being the first to plead guilty, but that does not create an extraordinary and compelling reason to reduce his sentence. Cf. Acuna v. United States, No. 07-00615, 2020 WL 2857492 at *3 (D. Hawai'i June 2, 2020) ("Acuna may now regret having rejected plea offers, but that does not create an "extraordinary and compelling reason" to reduce his sentence.").

when his involvement in the conspiracy began and 24 at the time of sentencing. Mot. at 16. Jackson cites various sources to support his point that the brain is immature and still developing up until age 25 and, therefore, individuals under 25 are more likely to act recklessly and impulsively. Id. at 15–17. The Government contends that Jackson's argument overlooks the fact that his association and activity within the conspiracy took place over years and involved multiple acts by Jackson; "[h]e didn't merely commit a single one-off offense in a fit of immaturity." Resp. at 20.

Some courts have held that a defendant's youth—coupled with other factors such as a harsh sentence, illness, or record of rehabilitation—can constitute extraordinary and compelling reasons for release. See, e.g., United States v. McDonel, No. 07-20189, 2021 WL 120935, at *4 (E.D. Mich. Jan. 13, 2021). However, for the reasons set forth in this opinion, there are no other factors that could couple with Jackson's youth to constitute extraordinary and compelling reasons for release.

Further, even if youth were alone sufficient, Jackson's age at the time of the offense— roughly 18 to 24—is not so extraordinary that it warrants a sentence reduction. Sadly, many defendants within this age range commit crimes, perhaps, as Jackson argues, due to the fact that the brain continues to develop until the age of 25. But this means that Jackson's commission of crimes at those ages is unfortunate, not extraordinary.

### C. The § 3553(a) Factors

The § 3553(a) factors also weigh against granting Jackson a sentence reduction. Before granting a sentence reduction under the First Step Act, the Court must consider the § 3553(a) factors, which include the nature and circumstances of a defendant's offenses, the seriousness of the offenses, the need to promote respect for the law, and the need to protect the public from further

crimes by the defendant. Jackson's offense was serious. He was associated with a violent gang that committed crimes including murders, robberies, and distribution of controlled substances. Plea Agreement at 3. In furtherance of the gang's activities, Jackson dealt controlled substances including marijuana, cocaine, oxycodone, and morphine. Id. at 6–7. These drugs are classified as Schedule I or Schedule II substances due to their high potential for abuse. The circulation of such addictive drugs in the community presents a grave danger to the community's health and wellbeing.

Jackson argues that his post-sentencing conduct—which includes only one disciplinary infraction that occurred over two years ago, participation in self-study classes and a drug education program, his "medium" risk of recidivism, and his job as the orderly on his unit—weighs in favor of granting him release. This recent behavior is laudable, and the Court encourages Jackson to keep on the right path. However, Jackson has not been on this path long enough to warrant release at this time. Jackson's risk assessment records reveal that prior to August 2020—less than a year ago—he was classified as having a "high" risk of recidivism. Risk Assessment (Dkt. 1423-7). Further, Jackson's records indicate that there are some areas of BOP programming that he has simply refused to be evaluated for, including "antisocial peers," "cognitions," and "trauma." Id.

Further, Jackson's record raises serious doubts as to whether he would abide by release conditions. While Jackson was on probation—following his Michigan conviction for a firearms offense in 2015—he was located in Huntington, West Virginia, a location where the 6 Mile Chedda Grove dealt controlled substances, with a bag of heroin. As a result, Jackson violated the terms of his probation by both unauthorized out-of-state travel and commission of a crime. There is a serious risk that if released early Jackson would, again, deal drugs, thereby endangering the community.

12

The parties debate whether the length of time that Jackson has already served weighs towards granting or denying his motion. Two disagreements underlie the parties' debate. First, the parties appear to be using different starting points to determine how much time Jackson has already served. Whereas Jackson contends that he consented to detention on December 6, 2016 and, therefore, has served over four years of his sentence, Mot. at 4, the Government argues that Jackson began serving his custodial sentence on October 22, 2018 and, therefore, has served just over two-and-a-half years of his sentence, Resp. at 3, 22. Second, Jackson again raises the argument that his sentence is unjustifiably disproportionate as compared to certain co-defendants, thereby suggesting that the time that he has served is sufficient as compared to the sentence Jackson should have received (one comparable to his co-defendants'). The Court has already rejected Jackson's argument that his sentence is unjustifiably disproportionate as compared to certain co-defendants. The length of time that Jackson has served is rightly compared to the overall sentence that he faces—114 months—not that of his co-defendants. Even assuming that Jackson has served four years of his sentence, this still means that he has served less than half of his sentence. Multiple courts have held that it is inappropriate to release a defendant who has served less than half of his sentence. See, e.g., United States v. Ruffin, 978 F.3d 1000, 1008 (6th Cir. 2020) (affirming district court decision that § 3553(a) factors did not support a sentence reduction in part because the defendant was yet to serve even half of his sentence); United States v. Richards, No. 12-20372, 2021 WL 912389, at *3 (E.D. Mich. Mar. 10, 2021) ("[A]llowing Defendant to be released after serving less than half of his sentence would not promote respect for the law or proper deterrence, [or] provide just punishment . . . ."). So too it is inappropriate here.

Although the Court is sympathetic towards Jackson's argument that he was youthful when he began his involvement with the 6 Mile Chedda Grove, the Court is also mindful of the fact that

Jackson's involvement in the gang was not a one-time impulsive decision. Rather, Jackson chose to continue his involvement with the gang over the course of several years, dealing highly addictive drugs. Further, the Court cannot ignore the fact that Jackson has established, through his offenses as a member of the gang, that he is a danger to the community. If released at this time, there is a real possibility that he would commit more crimes. Granting Jackson compassionate release would not promote respect for the law or protect the public from further crimes by Jackson.

The § 3553(a) factors weigh against granting Jackson's motion for a compassionate release.

### IV.  CONCLUSION

For the reasons stated above, Jackson's motion for a sentence reduction (Dkt. 1422) is denied.

SO ORDERED.

Dated: June 2, 2021  
 Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge